This is an appeal from the award of benefits to a worker in a workers' compensation action. The claim relates to an injury to Rachel Brown ("the worker") that was allegedly sustained during a period of employment with Valtex, Inc. ("the company"). The term of employment was four and one-half months, lasting from June 1999 until October 14, 1999.
After working for the company for approximately one year in 1995, the worker quit in order to stay home with her children. Before going to work with the company in 1995, the worker had been employed at fast-food restaurants and as a seamstress for other companies. At her previous seamstress jobs, the worker had sewed hundreds of garments per day during 8- or 10-hour shifts. The worker testified that she had no problems with her neck or shoulders before returning to work for the company in 1999.
The worker's job was to sew binding onto fleece garments. She would then bind the garments into bundles of approximately 25 garments and throw the bundles into a basket. The position required her to be "hunkered" over the sewing machine and also to turn at her midsection to toss the bundles of garments into a basket.
In early October 1999, the worker began to experience headaches and shoulder aches, as well as neck and arm aches. The worker claimed that the onset of the problems was during a period when she was performing not only her work but another employee's work as well. However, the worker admits that during the workweek ending on October 1, 1999, she worked 40 hours and that during the workweek ending on October 8, 1999, she worked only 16.5 hours.
The worker testified that she told her supervisor, Bonnie Manning, about her pain. The worker never requested to see a doctor. Additionally, at no time did Manning offer to send the worker to a doctor. After working with her pain for approximately a week, the worker left work on October 14, 1999, and did not return. She went to see Dr. Linda Clemons, who referred her to Dr. Larry Parker. On her first visit to Dr. Parker, she completed two forms. On one form she was asked if the visit was related to workers' compensation, but she did not respond to that question. She also did not respond to a question regarding her date of injury and the onset of pain. However, she did indicate in response to a question that she may have been injured at work. She did not discuss a work-related injury with Dr. Parker. During her treatment, it was indicated in her record that the worker was trying to file a workers' compensation claim. *Page 334 
During the worker's first visit with Dr. Parker, he examined her and took X-rays. The X-rays revealed mild degenerative changes at the C2 level of the spine but were otherwise unremarkable. Dr. Parker testified that such changes can be due to a host of causes, including genetic issues, daily wear and tear, and daily life-pattern issues.
Dr. Parker also ordered that an MRI be performed on the worker. The MRI revealed mild degenerative changes at the C4-5 and C5-6 levels of the spine, which indicated findings of a bone spur but no other abnormalities. Bone spurs are considered to be the result of a degenerative process. Based on the results of the MRI, Dr. Parker felt that the worker may have tendonitis. Dr. Parker could not say with any degree of medical certainty what had caused the worker's symptoms. Dr. Parker testified that he would be speculating to state that the worker's employment caused her symptoms.
The standard of review in a workers' compensation case has been stated by our supreme court:
 "[W]e will not reverse the trial court's finding of fact if that finding is supported by substantial evidence — if that finding is supported by `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'"
Ex parte Trinity Indus., Inc., 680 So.2d 262, 268-69 (Ala. 1996) (quoting West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989)). However, "[i]n reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness." § 25-5-81(e)(1), Ala. Code 1975. The worker claimed that she had suffered repetitive injuries to her neck and shoulders that had affected her ability to work as a normal individual. The worker admitted that there was no "pop" or single instance from which the pain arose. The type of injury claimed is, therefore, "nonaccidental." Ex parte Trinity Indus.,680 So.2d at 266. In Ex parte Trinity Industries, the supreme court stated:
 "Whether an accidental injury `arises out of' the claimant's employment is basically a question of whether there is a causal relationship between the claimant's performance of his or her duties as an employee and the complained-of injury. Determining whether a causal relationship has been established between the performance of the claimant's duties as an employee and the complained-of injury is especially difficult and troublesome when the complained-of injury was not produced by some sudden and traumatic external event. For simplicity, we will refer to such events as `nonaccidental' injuries. More than 50 years ago, in Pow v. Southern Constr. Co., 235 Ala. 580, 180 So. 288 (1938), this Court held that the term `accident arising out of employment' included more than just incidents in which injuries arise from sudden and traumatic external causes."
Ex parte Trinity Indus., 680 So.2d at 266 (footnote omitted).
Every injury that may be related to a person's employment is not, however, compensable. See Ex parte Trinity Indus.,680 So.2d at 265. The burden is on a worker to prove that his or her injuries arose out of and in the course of his or her employment.680 So.2d at 262. In cases involving gradual deterioration or cumulative stress, a worker must establish legal and medical causation by clear and convincing evidence. Safeco Ins. Cos. v.Blackmon, 851 So.2d 532 (Ala.Civ.App. 2002); § 25-5-81(c), Ala. Code 1975. The *Page 335 
Workers' Compensation Act, § 25-5-1 et seq., Ala. Code 1975, provides:
 "For the purposes of this . . . act, `clear and convincing' shall mean evidence that, when weighted against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
§ 25-5-81(c), Ala. Code 1975. To establish legal causation a worker must show that "the performance of his or her duties as an employee exposed him or her to a danger or risk materially in excess of that to which people are normally exposed in their everyday lives." Ex parte Trinity Indus., 680 So.2d at 267. To show medical causation, a worker must show that a risk to which he or she was exposed was a contributing cause. Ex parte TrinityIndus., 680 So.2d at 269; Safeco Ins. Cos. v. Blackmon, supra. In Ex parte Trinity Industries, the supreme court cautioned, "[m]erely showing that there is a close spatial or temporal relationship between the injury and the place or time of the claimant's performance of his or her job is not in itself always sufficient to satisfy either of the two prongs of Alabama's workers' compensation nonaccidental injury causation test." Exparte Trinity Indus., 680 So.2d at 269.
The company contends that the worker did not offer clear and convincing evidence that her gradual-deterioration or cumulative-physical-stress injury arose out of and in the course of her employment, i.e., that her physical condition was work related. We agree.
A claim regarding gradual deterioration or cumulative physical stress, such as this one, requires that the worker prove by clear and convincing evidence both legal causation and medical causation. Safeco Ins. Cos. v. Blackmon, supra. The worker testified that her numerous sewing jobs required her to be "hunkered over a machine." The worker testified as to the physical demands and the required movements of a sewing job. She stated that she was at the sewing machine 8 to 10 hours per day sitting. She also testified that when she was finished with a bundle of 25 to 35 garments, she would stand up, twist her body, and toss the garments into a basket. The trial court could have found that this testimony established that the worker was exposed to a danger or risk materially in excess of that to which people not so employed are exposed to in their everyday lives.
However, the worker failed to produce clear and convincing evidence that the risk to which she was exposed contributed to her injury. The worker testified that she was not in pain until her most recent employment with the company. The court based its conclusions regarding medical causation on the worker's lay testimony and on Dr. Parker's expert testimony, which the trial court described as "somewhat equivocal." The trial court opined:
 "While Dr. Parker was somewhat equivocal on the issue of causation, his deposition testimony, admitted by stipulation of the parties, and taken as a whole, reflects the most likely cause of the [worker's] physical symptoms as being repetitive motion which aggravated a cervical bone spur creating soreness and tingling in the [worker's] left shoulder and arm. Dr. Parker could not rule out repetitive motion from sewing as a possible cause for her problems." *Page 336 
Dr. Parker's expert testimony reflected that there were any number of possible causes for the soreness and tingling of the worker's left arm. He testified that the worker's job was one of a range of possibilities that might have caused her injury. He also could not rule out genetics, everyday wear and tear, or lifting children as possible causes for the worker's injury.
 "Q [By counsel for the company]: I guess what I'm asking is whether you can say with any degree of medical certainty whether this was caused by an injury as opposed to some sort of other trauma she received or just some sort of aging process?
 "A [By Dr. Parker]: Based on the history as of October 18, 1999 and the conclusion of her diagnosis the answer to your question would be no. I cannot say with any degree of medical certainty exactly what the cause of her symptoms were.
". . . .
 "Q: And did I understand you earlier to say that you're not able to relate her symptoms with any degree of medical certainty to her employment as opposed to some other cause; is that a correct statement?
 "A: Based on the history that I was given there's no specific indication by my records or the patient's records of the exact cause — the exact cause of her symptoms.
 "Q: So you're unable to relate it with any reasonable degree of medical certainty?
"A: That's correct.
". . . .
 "Q: Now, the question had been asked earlier whether or not bone spurs are caused by trauma or other things, and I believe the conventional medical wisdom is that bone spurs can come from many things; is that true?
 "A: That's — I would not disagree with that statement.
". . . .
 "Q: And is it also a medical possibility that repetitive use of one's neck in a bend (sic) and flexed position over many hours of work over many years of work at a sewing factory could cause a bone spur to become symptomatic?
". . . .
"A: That's a possibility, medical possibility.
". . . .
 "Q: And of all the possible causes of these symptoms that Mrs. Brown reported one of the — one of the things in the differential possible diagnosis or possible thinking as to what might have caused — one of the possibilities is repetitive use of her neck in connection with her employment?
". . . .
 "A: Basically, I cannot state with any degree of medical certainty based on the information that I have available in my records as to the cause of Mrs. Brown's symptoms in any degree.
". . . .
 "Q: . . . [T]he Plaintiff's lawyer asked you about one cause of her symptoms being her job as opposed to another cause being lifting of her children or various other causes. For you to say that one of those things caused her symptoms as opposed to another would simply be speculation on you part, wouldn't it?
"A: That's correct."
(Emphasis added.)
"It is a well established principle that evidence presented by a work [ers'] compensation claimant must be more than evidence of mere possibilities that would serve to `guess' the employer into liability." *Page 337 Hammons v. Roses Stores, Inc., 547 So.2d 883, 885 (Ala.Civ.App. 1989) (citing Stewart v. Busby, 51 Ala.App. 242, 245,284 So.2d 269, 272 (Civ. 1973)). Dr. Parker's testimony is only evidence of mere possibilities that would "guess" the company into liability.
Only the worker's testimony implies that her employment was a contributing cause to her injury. However, in Ex parte SouthernEnergy Homes, Inc., 873 So.2d 1116 (Ala. 2003), our supreme court examined a case with conflicting medical expert testimony on medical causation. The worker in that case testified that her employment was a contributing factor to her injuries. The court held that "the testimony of the doctors [who treated the worker] at best established a possibility that [the worker's] back condition was caused by her alleged on-the-job injury." Exparte Southern Energy Homes, Inc., 873 So.2d at 1122 (concluding that the worker's testimony alone was not sufficient to establish medical causation).
The standard of proof regarding medical causation is clear and convincing evidence. There is not even substantial evidence of medical causation in this case. The trial court's judgment is therefore reversed, and the cause is remanded.
The company's motion to strike the worker's deposition testimony that was not admitted at trial is granted.
REVERSED AND REMANDED.
YATES, P.J., and THOMPSON and PITTMAN, JJ., concur.
MURDOCK, J., concurs in the result, without writing.